IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| WILLIAM EARL RAYFORD | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | |
| | § | NO. 3-06-CV-0978-B-BD |
| RICK THALER, Director | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division | § | |
| | § | |
| Respondent. | § | |

**FINDINGS AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Petitioner William Earl Rayford, a Texas death row inmate, has filed an application for writ

of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons stated herein, the application should

be denied.

I.

A Dallas County jury convicted petitioner of capital murder and sentenced him to death. His

conviction and sentence were affirmed on direct appeal. *Rayford v. State*, 125 S.W.3d 521 (Tex.

Crim. App. 2003), *cert. denied*, 125 S.Ct. 39 (2004). Petitioner also filed an application for state

post-conviction relief. The application was denied on the findings of the trial court. *Ex parte

Rayford*, WR-63,201-01, 2006 WL 1413533 (Tex. Crim. App. May 24, 2006). Petitioner then filed

this action in federal district court.

II.

In multiple grounds for relief, petitioner contends that: (1) the jury was not chosen from a

fair cross-section of the community; (2) he was denied the right to an impartial jury when the trial

court failed to remove a biased juror for cause; (3) his due process rights were violated when a 1986 murder conviction was introduced into evidence during the punishment phase of trial; (4) he was denied the right to individualized sentencing when the trial court refused to admit certain medical records related to a suicide attempt following the 1986 murder; (5) the testimony of Royce Smithey, an expert on Texas prisons, should have been excluded by the trial court; (6) the prosecutor improperly commented on his failure to testify; (7) the standard instructions given to capital sentencing juries in Texas are unconstitutional; (8) the Eighth Amendment bars his execution because he suffers from a mental illness; (9) he received ineffective assistance of counsel at trial and on appeal; and (10) the cumulative effect of these errors denied him a fair trial.

## A.

The standard of review in federal habeas cases is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See* Pub.L. 104-132, 110 Stat. 1214 (1996). Where a state court has already rejected the claims raised by petitioner, a federal court may grant habeas relief only if the state court adjudication:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary" to clearly established federal law if "it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts." *Busby v. Dretke*, 359 F.3d 708, 713 (5th Cir.), *cert. denied*, 124 S.Ct. 2812 (2004), *citing Williams v. Taylor*,

529 U.S. 362, 405-06, 120 S.Ct. 1495, 1519-20, 146 L.Ed.2d 389 (2000). A decision constitutes an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 120 S.Ct. at 1523; *see also Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001). Factual determinations made by the state court are presumed to be correct and are unreasonable only where the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Threadgill v. Quarterman*, No. 3-05-CV-2217-D, 2009 WL 2448499 at *5 (N.D. Tex. Aug. 10, 2009) (citing cases), *aff'd*, No. 09-70024, 2011 WL 1812764 (5th Cir. May 12, 2011). This presumption applies not only to explicit findings of fact, but "it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Threadgill*, 2009 WL 2448499 at *5, *quoting Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001), *cert. denied*, 123 S.Ct. 106 (2002); *see also Harrington v. Richter*, ___ U.S. ___, 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011) ("[D]etermining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.").

On federal habeas review, the district court reviews "only the ultimate decision of the state court, and not the specific contents of its reasoning or opinion." *Blanton v. Quarterman*, 543 F.3d 230, 236 (5th Cir. 2008), *cert. denied*, 129 S.Ct. 2383 (2009). When the Texas Court of Criminal Appeals denies post-conviction relief without written order on findings of the trial court, the federal habeas court "(1) assumes that the state court applied the proper 'clearly established Federal law'; and (2) then determines whether its decision was 'contrary to' or 'an objectively unreasonable application

of that law." *Threadgill*, 2009 WL 2448499 at *5, *quoting Schaetzle v. Cockrell*, 343 F.3d 440, 443 (5th Cir. 2003), *cert. denied*, 124 S.Ct. 1156 (2004).

## B.

Petitioner was charged with the capital murder of his former live-in girlfriend, Carol Hall, while committing or attempting to commit a kidnaping. (*See* St. App. Tr. at 2; SF-42 at 47, 64).[1] At trial, Hall's son, Benjamin Thomas, who was 11 years old at the time of the offense, testified to the events surrounding the death of his mother. (*See* SF-42 at 48). On the morning of November 16, 1999, petitioner entered Hall's home and began arguing with her. (*Id.* at 52). When Thomas came out of his room in response to his mother's cries, petitioner hit him on the head and stabbed him in the back. (*Id.* at 52-53). Hall started to run away from the house, but petitioner ran after her and caught her before she could reach the next house. (*Id.* at 54, 57-58). As Thomas followed, he saw petitioner pick Hall up and throw her over his shoulder. (*Id.* at 58). Hall was screaming and hitting petitioner on the back as petitioner carried her toward a creek behind her house. (*Id.* at 58, 78-79). Thomas ran to the house next door to notify the police, who arrived soon thereafter and began searching for Hall. (*Id.* at 62, 91-94).

Approximately an hour after the police search began, petitioner was apprehended in Hall's backyard. (*Id.* at 95-96). DNA from blood found on petitioner matched Hall's DNA. (*See* SF-44 at 11-12, 15-16). Later that morning, a police officer found Hall's dead body inside a culvert pipe near Hall's home. (SF-42 at 113, 115, 124). An autopsy of the body performed by Dallas County Medical Examiner Jennie Duvall found evidence of both ligature and manual strangulation, blunt-

---

[1] Under Texas law, a person commits capital murder if he intentionally or knowingly causes the death of an individual while in the course of committing or attempting to commit certain felony offenses, including kidnaping. *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon Supp. 1994).

force injuries to the head, a blow to the face and scalp, sharp force injuries, including a stab wound

on the back part of the head, a black eye, defensive wounds on Hall's hands, and other assorted cuts,

lacerations, abrasions and contusions. (SF-44 at 29, 38-40, 53, 62-63, 68-69). Duvall testified that

Hall was alive when strangled and that the cause of death was "strangulation with blunt and sharp

force injuries." (*Id.* at 61-62, 71-72). Based on the injuries, scene photos, and police report, Duvall

concluded that Hall died somewhere in the culvert. (*Id.* at 106). The jury found that Hall was

kidnaped in the course of the homicide, making petitioner eligible for the death penalty. (St. App.

Tr. at 130, 137-38; SF-45 at 72).

## C.

In one of his grounds for relief, petitioner contends that the jury in his case was not chosen

from a fair cross-section of the community because young adults 18 to 34 years old and Hispanics

were not adequately represented on the venire panel. (*See* First Am. Hab. Pet. at 62-68).[2] The Sixth

Amendment requires that a jury be selected from a representative cross-section of the community.

*See Taylor v. Louisiana*, 419 U.S. 522, 530, 95 S.Ct. 692, 697-98, 42 L.Ed.2d 690 (1975). Thus,

jury venires must not systematically exclude distinctive groups in the community. *See Duren v.

Missouri*, 439 U.S. 357, 363-64, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). In order to establish a

*prima facie* Sixth Amendment violation, a defendant must show that: (1) the excluded group is a

distinctive group in the community; (2) representation of the group in venires from which juries are

selected is not fair and reasonable in relation to their number in the community; and (3) this

underrepresentation is due to systematic exclusion of the group in the jury selection process. *Id.*, 99

---

[2] It is unclear whether petitioner also complains about the lack of veniremembers with incomes under $35,000. To the extent petitioner seeks relief on this ground, his claim is unexhausted and procedurally barred. Moreover, like his claim involving Hispanics and young adults, petitioner cannot show that people with incomes under $35,000 were systematically excluded in the jury selection process.

S.Ct. at 668. The Sixth Amendment does not require petit juries, as opposed to panels or venires, to reflect the composition of the community at large. *See Taylor*, 95 S.Ct. at 702; *Lockhart v. McCree*, 476 U.S. 162, 173, 106 S.Ct. 1758, 1765, 90 L.Ed.2d 137 (1986). All that is required is that "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Taylor*, 95 S.Ct. at 702. A process systematically excludes a group in violation of the Sixth Amendment if the underrepresentation of that particular group is "inherent in the particular jury-selection process utilized." *Duren*, 99 S.Ct. at 669.

Petitioner has not established that there was any systematic exclusion of young adults or Hispanics from venire panels in Dallas County. In essence, petitioner complains that these groups, while summoned to jury service, choose not to report for a variety of reasons, including low juror pay, the failure of the State to require employers to pay jurors when they serve, and because jury summonses are not enforced by Dallas County authorities. *See Ex parte Rayford*, WR-63,201-01, Tr. 1 at 181-83. Petitioner's reliance on *Taylor* is misplaced. At issue in *Taylor* was the constitutionality of a state law that provided "a woman should not be selected for jury service unless she had previously filed a written declaration of her desire to be subject to jury service." *Taylor*, 95 S.Ct. at 694. No comparable law or policy pertaining to young adults or Hispanics exists in this case. At most, their underrepresentation on Dallas County venire panels is an indirect consequence of low juror pay and the failure to enforce jury summonses. This ground for relief should be overruled. *See Hearn v. Cockrell*, 73 Fed. Appx. 79, 79, 2003 WL 21756441 at *5-*6 (5th Cir. Jun. 23, 2003), *cert. denied*, 124 S.Ct. 579 (2003) (rejecting similar claim that low juror pay resulted in

underrepresentation of Hispanics on venire panels because petitioner could not show clear evidence of systematic exclusion like that in *Taylor*).

## D.

Petitioner also alleges that he was denied the right to an impartial jury as a result of the trial court's failure to remove a veniremember, Diane Potts, for cause. (*See* First Am. Hab. Pet. at 71-76). Where a challenged juror is removed by use of a peremptory challenge following the trial court's denial of a challenge for cause, a petitioner is entitled to federal habeas relief only if he demonstrates that the jury ultimately selected to try the case was not impartial. *See Dorsey v. Quarterman*, 494 F.3d 527, 533 (5th Cir. 2007), *cert. denied*, 128 S.Ct. 1444 (2008), *citing Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988). Here, the defense used a peremptory strike to remove Potts from the jury after the trial court denied a challenge for cause. (*See* SF-34 at 85). Although petitioner charges that the use of this peremptory strike resulted in the empaneling of a veniremember who was "not an acceptable juror," (*see* First Am. Hab. Pet. at 71), this conclusory allegation does not even begin to establish that the jury ultimately selected to try the case was not impartial. *See Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983) (conclusory allegations do not raise constitutional issues in federal habeas proceedings).[3]

---

[3] Even if Potts had served on the jury, petitioner would not be entitled to habeas relief. While Potts expressed a strong personal preference for the death penalty, (*see generally*, SF-65 at Quest. for Juror No. 2556 at 1-3, 8 & SF-34 at 74, 77-78), she repeatedly said that she could presume a capital murder defendant innocent and could follow the law. (*See* SF-34 at 60, 64, 73, 76, 82-83). Based on this testimony, the Texas Court of Criminal Appeals found that Potts was not biased or prejudiced against the law and, therefore, was not subject to a challenge for cause. *Rayford*, 125 S.W.3d at 531-32. Petitioner has failed to show that this determination was unreasonable. *See Miniel v. Cockrell*, 339 F.3d 331, 339-340 (5th Cir. 2003), *cert. denied*, 124 S.Ct. 1413 (2004) (rejecting juror-bias claim where record showed that, while juror expressed a strong personal preference for the death penalty, he was able to differentiate between his personal feelings and the requirements of Texas law).

E.

In his next ground for relief, petitioner contends that his due process rights were violated when his 1986 conviction for the murder of his wife, Gail Rayford, was introduced into evidence during the punishment phase of the trial. (*See* First Am. Hab. Pet. at 53-59). As part of its case on future dangerousness, the prosecution introduced a pen packet containing a certified copy of this prior felony conviction to which petitioner entered a plea of *nolo contendere*. (*See* SF-46 at 8 & St. Exh. 87). Petitioner argues this plea was not knowingly, voluntarily, and intelligently made because there is "clear and compelling evidence that [he] was mentally ill in 1986, which could have compromised his critical thinking and decision making functions[.]" (First Am. Hab. Pet. at 56). In a related claim, petitioner contends that he received ineffective assistance of counsel in connection with his 1986 plea. (*Id.* at 56-59).

Although cast as a due process challenge to his current conviction, this claim is actually a challenge to the validity of the plea entered by petitioner in his 1986 murder case. The United States Supreme Court has clarified that federal habeas relief is generally not available for such claims. *Lackawanna County Dist. Attorney v. Coss*, 532 U.S. 394, 402-04, 121 S.Ct. 1567, 1573-74, 149 L.Ed.2d 608 (2001). In *Lackawanna*, the Supreme Court held that:

> [O]nce a state conviction is no longer open to direct or collateral attack in its own right because the defendant failed to pursue those remedies while they were available (or because the defendant did so unsuccessfully), the conviction may be regarded as conclusively valid. If that conviction is later used to enhance a criminal sentence, the defendant generally may not challenge the enhanced sentence through a petition under § 2254 on the ground that the prior conviction was unconstitutionally obtained.

121 S.Ct. at 1574 (internal citation omitted). This rule applies in death penalty cases where a petitioner argues that an invalid prior conviction was used as an aggravating circumstance supporting

his death sentence. *See Abdus-Samad v. Bell*, 420 F.3d 614, 629-30 (6th Cir. 2005), *cert. denied*, 127 S.Ct. 380 (2006); *Hubbard v. Haley*, 317 F.3d 1245, 1255-57 (11th Cir.), *cert. denied*, 124 S.Ct. 390 (2003). The only exception to this rule is that a petitioner may challenge a prior conviction used to enhance his sentence on the ground that there was a failure to appoint counsel in violation of the Sixth Amendment. *Lackawanna*, 121 S.Ct. at 1574, *citing Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Whatever legal recourse petitioner may have had to challenge his 1986 murder conviction, it expired long ago. Petitioner concedes -- and the record reflects -- that he was represented by appointed counsel at all critical stages of the 1986 murder case, including his plea. (*See* First Am. Hab. Pet. at 54-55; St. Exh. 87 at 3). Therefore, this claim does not fit within the small exception carved out by *Lackawanna*, and petitioner cannot show an entitlement to federal habeas relief.

Moreover, petitioner has failed to show that he was mentally incompetent at the time he entered his plea. The recitations on the written judgment accompanying the plea state that:

> (1)    defendant, in person and in writing in open Court waived his right of trial by jury;
>
> (2)    defendant was admonished by the Court of the consequences of the plea and persisted in entering the plea;
>
> (3)    it plainly appeared to the Court that defendant was mentally competent and the plea was free and voluntary;
>
> (4)    defendant in open court in writing waived the reading of the charging instrument, and the appearance, confrontation, and cross-examination of witnesses; and
>
> (5)    it appeared to the Court that defendant was mentally competent and understood the proceedings.

*Ex parte Rayford*, WR-63,201-01, Tr. 9 at 2732-33. (*See also* St. Exh. 87). The record in the 1986

murder case also contains a psychiatric evaluation of petitioner performed by Dr. Clay Griffith. *See*

*Ex parte Rayford*, WR-63,201-01, Tr. 9 at 2700-2702. After interviewing petitioner, Dr. Griffith

opined in a letter to the court that petitioner "[had] sufficient present ability to consult with his

lawyer with a reasonable degree of rational understanding and [had] a rational as well as factual

understanding of the proceedings against him and [was] competent to stand trial." *Id.*, Tr. 9 at 2702.

Based on Dr. Griffith's letter and the recitals in the written plea agreement signed by petitioner, the

state habeas court found that "the trial court's finding of competence in the 1986 plea proceeding was

supported by the evidence and should not be disturbed." *Id.*, Tr. 11 at 3278, ¶ 270.

      In an attempt to cast doubt on the validity of his 1986 plea, petitioner relies on the affidavit

of Dr. Gilda Kessner, a forensic and clinical psychologist. *See id.*, Tr. 1 at 101 & *id.*, Tr. 2 at 279-80,

¶¶ 14.0-14.2. After conducting a *post hoc* review of petitioner's hospital records and TDCJ medical

records, Dr. Kessner concluded:

> It is my opinion also that the serious depression from which Mr.
> Rayford suffered, as recorded in the medical records, compromised
> and limited his ability to make a voluntary, knowing, and intelligent
> plea. This is because persons, like Mr. Rayford, who suffer from
> depression frequently have problems with poor concentration,
> indecisiveness, and memory deficits. These problems compromise
> critical thinking and decision making.

*Id.*, Tr. 2 at 280, ¶ 14.2. This opinion by Dr. Kessner, provided nearly 17 years after the plea in

question, is not "clear and convincing" such that it can overturn the state habeas court's factual

finding of competency. *See* 28 U.S.C. § 2254(e)(1).

      Nor is petitioner entitled to federal habeas relief on the ground that he received ineffective

assistance of counsel in connection with his 1986 plea. Even if this claim is not barred under

*Lackawanna*, petitioner has failed to show that the performance of his attorney was in any way deficient. As proof that his lawyer, Daniel Parker, was not familiar with the facts or the law, petitioner points out that he entered his plea just three weeks after Parker was assigned to the case, and that the plea was made only 10 days after Parker filed a motion for continuance. (*See* First Am. Hab. Pet. at 57). However, neither of these facts proves that Parker lacked knowledge about the case or was not familiar with the law. Nowhere does petitioner indicate what additional evidence Parker would have uncovered had he more thoroughly investigated the 1986 murder case. Likewise, petitioner has not shown that his plea of *nolo contendere* was the result of deficient advice given by Parker. His conclusory assertions are insufficient to merit habeas relief. *See Chandler v. Quarterman*, No. 3-05-CV-1317-R, 2006 WL 3541558 at *11 (N.D. Tex. Nov. 7, 2006), *COA denied*, No. 07-10051 (5th Cir. Jun. 20, 2008), *citing Ross*, 694 F.2d at 1012 (habeas relief not warranted where petitioner failed to specify what additional investigation should have been conducted by counsel or what that investigation would have revealed); *Lampkins v. Dretke*, No. 7-02-CV-172-R, 2005 WL 1949505 at *6 (N.D. Tex. Aug. 12, 2005) (rejecting ineffective assistance of counsel claim absent evidence that counsel misadvised petitioner or failed to render reasonably competent advice).

### F.

Petitioner argues that he was denied the right to individualized sentencing when the trial court refused to admit medical records related to a suicide attempt following the 1986 murder of his wife. (*See* First Am. Hab. Pet. at 46-53). The right to individualized sentencing requires "that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis

for a sentence less than death." *Sigala v. Quarterman*, 338 Fed.Appx. 388, 391, 2009 WL 2169175 at *2 (5th Cir. Jul. 20, 2009), *cert. denied*, 130 S.Ct. 1506 (2010), *quoting Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (emphasis in original). However, not every exclusion of mitigating evidence violates this principle. For example, where the exclusion of evidence is based upon an "evenhanded application of rules governing the introduction of evidence," the trial court is not responsible for denying a defendant the *opportunity* to present mitigation evidence and, thus, does not violate his right to individualized sentencing. *See Byrne v. Butler*, 845 F.2d 501, 517 n.14 (5th Cir.), *cert. denied*, 108 S.Ct. 2918 (1988), *citing Skipper v. South Carolina*, 476 U.S. 1, 5-6, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1 (1986) (exclusion of documents did not violate right to individualized sentencing because counsel failed to lay proper foundation before attempting to introduce documents).

The court initially observes that petitioner's medical records, which purportedly contain evidence of his remorsefulness after a different murder, were arguably not mitigating at all. Moreover, the records were excluded because defense counsel failed to lay a proper predicate for their admission into evidence. (*See* SF-46 at 182-83). As petitioner concedes, his lawyer never attempted to introduce the records again. (*See* First Am. Hab. Pet. at 48). Because the medical records were excluded based on the "evenhanded application" of an evidentiary rule and petitioner was not prevented from proffering or re-urging the evidence, the trial court did not violate petitioner's right to individualized sentencing. *Byrne*, 845 F.2d at 517 n.14; *see also Riles v. McCotter*, 799 F.2d 947, 953 (5th Cir. 1986) (no due process violation where petitioner was not prevented from re-urging evidence).

## G.

Petitioner also challenges the testimony of Royce Smithey, an expert on Texas prisons. Specifically, petitioner argues that: (1) evidence offered through Smithey violated his right to individualized sentencing; (2) Smithey was not qualified as an expert; (3) his testimony was irrelevant; and (4) Smithey committed perjury. (*See* First Am. Hab. Pet. at 31-46).

## 1.

Smithey, the Chief Investigator for the Special Prison Prosecution Unit, testified for the state at the punishment phase of the trial to rebut evidence offered by the defense regarding prison violence. (*See* SF-47 at 58-153). Among the topics discussed by Smithey were administrative segregation, conditions on death row, opportunities for prison violence, methods of controlling prison violence, drug use and availability, the staffing of females in prisons, and interactions between female staff and inmates. (SF-47 at 89-97). Smithey told the jury that, depending on the age of the unit, an inmate in administrative segregation might still have contact with prison employees and other inmates. (*Id.* at 91). He testified that, despite the best efforts of prison staff, violence still occurs in even the most secured areas. (*Id.* 92). To illustrate the frequency of prison violence, Smithey explained that there were more than 2,000 reports of inmate assaults on prison staff and 1,700 inmate-on-inmate assaults in 1999. (*Id.* at 92-93). Smithey also stated that there are "probably" more female staff working in prisons that house male inmates than ever before because of federal law. (*Id.* at 95).[4]

---

[4] Contrary to petitioner's assertion, Smithey never told the jury that "an individual can be as violent as he chooses to be[.]" (First. Am. Hab. Pet. at 39, *citing* SF-47 at 74). This testimony was offered by Smithey at a hearing *outside* the presence of the jury.

2.

Petitioner contends that Smithey's testimony violated his right to individualized sentencing because it "failed to narrow the class of persons eligible for the death penalty" and "recast the 'probability' assessment in the first special issue into any 'possibility,' thus causing the jury to answer the future dangerousness issue in the affirmative for every capital offender." (First Am. Hab. Pet. at 41). In *Blystone v. Pennsylvania*, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990), the Supreme Court held that "[t]he requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence." *Id.*, 110 S.Ct. at 1083. Here, the state court followed *Blystone* in determining that the right to individualized sentencing "is not an evidentiary rule of exclusion," and that Smithey's testimony did not violate that right. *See Ex parte Rayford*, WR-63,201-01, Tr. 11 at 3238-39, ¶¶ 115-119. That determination was not unreasonable, particularly in light of the trial court's instruction to the jury to consider all mitigating evidence. (*See* St. App. Tr. at 133). This ground for relief should be overruled.

3.

Petitioner further contends that Smithey was not qualified to testify as an expert and that his testimony was irrelevant. Both claims are predicated on state evidentiary rules. However, federal habeas relief is only available to correct errors of constitutional dimension. *See* 28 U.S.C. § 2254(a); *Porter v. Estelle,* 709 F.2d 944, 957 (5th Cir. 1983), *cert. denied,* 104 S.Ct. 2367 (1984). State law issues, such as improper evidentiary rulings and the misapplication of state procedural rules, are not cognizable in a federal habeas proceeding unless the rulings were "so extreme as to result in a denial of a constitutionally fair [trial]." *Jackson v. Johnson,* 194 F.3d 641, 656 (5th Cir. 1999), *cert. denied,* 120 S.Ct. 1437 (2000).

Even if the court were not precluded from reviewing these claims, they are without merit. Under Texas law:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

TEX. R. EVID. 702. According to petitioner, Smithey was not qualified to testify as an expert because the prosecution failed to establish that: (1) his field of expertise was legitimate; (2) the subject matter of his testimony was within the scope of his field; and (3) his testimony properly used or relied on principles employed in the field. (*See* First. Am. Hab. Pet. at 42 n.4). The court disagrees. At the time of trial, Smithey was a 15-year veteran of the Special Prison Prosecution Unit and served as Chief Investigator for that Unit, in which capacity he supervised investigations and assisted with the prosecution of felonies inside the Texas prison system. *See Ex parte Rayford*, WR-63,201-01, Tr. 11 at 3247-48, ¶ 150, *citing* SF-47 at 59, 89-90. His qualifications include a bachelor's degree in law enforcement, teaching experience in the field of prison violence, and personal participation in the investigation of drug possession cases, murders, rapes, and assaults within the prisons. (*See* SF-47 at 61-63, 69, 90-91). Smithey testified that he is "intimately familiar" with prison violence, opportunities for prison violence, and methods prisons use to control violence. (*Id.* at 59). He is also familiar with statistics regarding prison violence, drug use and availability, prison staffing of females, and interaction between female employees and inmates. (*Id.* at 60). These credentials are more than sufficient to qualify Smithey as an expert on prison violence. Indeed, the Texas Court of Criminal Appeals has so held on multiple occasions. *See, e.g. Garcia v. State*, No. 71417, 2003 WL 22669744 at *5 (Tex. Crim. App. Nov. 12, 2003), *cert. denied*, 125 S.Ct. 267 (2004) (upholding trial

court's determination that Smithey was qualified to testify as an expert regarding potential future danger of placing capital defendant in administrative segregation); *Allen v. State*, No. AP-74951, 2006 WL 1751227 at *6 (Tex. Crim. App. Jun. 28, 2006), *cert. denied*, 127 S.Ct. 948 (2007) (same as to Smithey's qualifications to testify about the probability of violence within the prison system).[5]

Smithey's testimony was also relevant. Under Texas law, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401. In rejecting this claim on state habeas review, the trial court noted:

> Here, the State had the burden of proving, beyond a reasonable doubt, that there exists a probability that applicant, if allowed to live, would commit criminal acts of violence so as to constitute a continuing threat, whether in or out of prison.
>
> The Court finds that the evidence in this case showed that applicant's two murderous acts were committed against women. The jury also heard testimony from applicant's substance abuse parole case manager that applicant tested positive for cocaine and heroin between 1997 and 1999, when she stopped supervising him. The jury also received into evidence a TDCJ summary wherein applicant admitted to using marijuana, cocaine, heroin, barbituates, methamphetamines, LSD, dilaudids, and sniffing glue beginning at age 15 and the intravenous use of cocaine, amphetamines, and barbituates beginning at age 19.
>
> Given that applicant is a drug abuser who kills women, the Court finds that Smithey's testimony about prison violence, drug availability, and the staffing of females was relevant to explain the circumstances under which applicant would be living and gave the jury an idea of his opportunities for being violent in prison society.

---

[5] Even if Smithey was not qualified as an expert, he likely could have testified as a fact witness. *See Ramey v. State*, No. AP-75678, 2009 WL 335276 at *14 (Tex. Crim. App. Feb. 11, 2009), *cert. denied*, 130 S.Ct. 81 (2009).

*See Ex parte Rayford*, WR-63,201-01,Tr. 11 at 3241-42, ¶¶ 127-29 (internal citations omitted). Based on these findings, the state court concluded that Smithey's testimony was relevant to helping the jury decide the future dangerousness special issue. *Id.*, Tr. 11 at 3242, ¶¶ 130-31 (citing cases).

Petitioner relies on two opinions by the Texas Court of Criminal Appeals to support his irrelevancy argument: *Rachal v. State*, 917 S.W.2d 799 (Tex. Crim. App. 1996), *cert. denied*, 117 S.Ct. 614 (1996), and *Matson v. State*, 819 S.W.2d 839 (Tex. Crim. App. 1991). Both cases are readily distinguishable on the facts. In *Rachal*, the testimony deemed irrelevant was an expert's opinion that jury predictions of future dangerousness are generally inaccurate. *See Rachal*, 917 S.W.2d at 816. Clearly, such testimony differs from the testimony provided by Smithey. In *Matson*, the trial court excluded the testimony of a defense expert on the issue of future dangerousness because the expert lacked personal knowledge of the defendant and "based his opinion on experience in the criminal justice system and probability estimates 'in general' rather than on individuals with characteristics and backgrounds similar to those of [the defendant]." *Matson*, 819 S.W.2d at 852. That ruling was reversed on appeal because the expert was, in fact, asked hypothetical questions related to specific characteristics and the background of the defendant. *Id.*

While Smithey was not asked hypothetical questions *per se*, the questions posed to him related to petitioner's individual characteristics and background, much like those asked of the expert in *Matson*. Moreover, Smithey's testimony was narrower than the expert testimony in *Matson*, as he offered no probability assessment. Thus, as determined by the state habeas court, Smithey's testimony was relevant to petitioner's propensity for future dangerousness. *See, e.g. Ramey v. State*, No. AP-75678, 2009 WL 335276 at *14 (Tex. Crim. App. Feb. 11, 2009), *cert. denied*, 130 S.Ct. 81 (2009) (Smithey's testimony regarding general prison conditions both relevant and permissible);

*Lucero v. State*, 246 S.W.3d 86, 97 (Tex. Crim. App. 2008), *cert. denied*, 129 S.Ct. 80 (2008) ("Smithee's [*sic*] testimony that inmate violence can occur under current prison conditions had some relevance to, and would have aided the jury in determining, appellant's future dangerousness[.]").

Even if Smithey's testimony was erroneously admitted, petitioner would not be entitled to federal habeas relief. Essentially, Smithey testified that Texas prisoners sometimes commit acts of violence, escape from prison, and could potentially have access to females and drugs while in prison. None of this information would have been particularly surprising to the average juror. Certainly, petitioner has not shown that Smithey's testimony played a "crucial, critical, and highly significant role" in the punishment phase. Petitioner makes much of the fact that this testimony raised the likelihood in jurors' minds that he could present a danger to female staff members. (*See* First Am. Hab. Pet. at 35-37). While this danger was relevant given petitioner's past history of violence towards women, there is no reason to believe that the jury would have limited its future dangerousness analysis to that category of victims, especially in view of evidence that petitioner also viciously attacked an 11 year-old boy. (*See* SF-42 at 48, 52-53, 84-87). This ground for relief should be overruled.

4.

Petitioner accuses Smithey of committing perjury by "creat[ing] a false impression that overestimated TDCJ inmate violence, and exaggerated the possibility that Rayford would be a future danger to TDCJ staff -- particularly the female staff in TDCJ -- were he to be given a life sentence." (First Am. Hab. Pet. at 35). In support of this claim, petitioner submits an affidavit from Dr. Mark Cunningham, who states:

> While thousands of staff assaults occurred in the year prior to 2000, these could include any physically aggressive conduct toward

staff–the vast majority of which resulted in no or minimal injury. Such a broad definition of 'staff assault,' however, provided little useful information on the frequency of the more aggressive conduct of primary institutional concern. Accordingly, in January 1998 (see footnote of October 2000 EAC report [ ], TDCJ began maintaining separate counts of assaults with and without a weapon toward staff or inmates...This statistical information reflects that assaults on staff utilizing an actual weapon (as defined in the subcategory) represented only 3% of all staff assaults in October 2000 (a ratio that is quite stable on an annual basis). Mr. Smithey did not advise the jury that this assaultive misconduct of greatest risk to staff represented less than 1/20th of one percent of the inmates in TDCJ in the preceding year.

*See Ex parte Rayford*, WR-63,201-01, Tr. 2 at 217-18. In essence, petitioner contends that Smithey misled the jury by failing to present more detailed statistics showing the type of injury caused and weapons used during prison assaults. (*See* First Am. Hab. Pet. at 36).

The due process clause prohibits the use of perjured testimony to obtain a conviction. *See Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Black v. Collins*, 962 F.2d 394, 407 (5th Cir.), *cert. denied*, 112 S.Ct. 2983 (1992). In order to establish a due process violation based on the use of perjured testimony, a habeas petitioner must prove that: (1) the testimony was false; (2) the prosecutor knew it was false; and (3) the evidence was material. *See Blackmon v. Scott*, 22 F.3d 560, 565 (5th Cir.), *cert. denied*, 115 S.Ct. 671 (1994). False testimony is material if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Creel v. Johnson*, 162 F.3d 385, 391 (5th Cir. 1998), *cert. denied*, 119 S.Ct. 2027 (1999), *quoting Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993).

At trial, Smithey testified:

> Q. [BY PROSECUTOR]: Do you know how many assaults on staff there were last year by inmates?

A. [BY SMITHEY]: I believe there were over 2100 I believe last year.

Q. Over 2000 assaults on staff?

A. Yes, sir.

Q. How about assaults between inmates?

A. I believe there were over 1700 inmate assaults.

(SF-47 at 93). These statistics comport with the Emergency Action Center ("EAC") report upon which Smithey based his testimony. (*See id.* at 65-66, 81) (describing reliance on EAC report published by TDCJ); *see also Ex parte Rayford*, WR-63,201-01, Tr. 9 at 2658 (EAC report showing that 1,704 offender assaults and 2,044 staff assaults occurred in 1999). The omission of more detailed statistical information related to these assaults did not render Smithey's testimony false. In fact, Dr. Cunningham described Smithey's testimony as "technically correct." *See Ex parte Rayford*, WR-63,201-01, Tr. 2 at 217. This ground for relief should be overruled.[6]

H.

Next, petitioner contends that the prosecutor improperly commented on his failure to testify by arguing to the jury that "since [defense counsel] didn't spend much time on the mitigation question, simply because there is not mitigation in this case." (First Am. Hab. Pet. at 59-61, *citing* SF-47 at 201-02). Petitioner apparently believes that this jury argument violated his Fifth Amendment privilege against self-incrimination because he was the only potential witness who could have provided additional mitigation evidence. The court disagrees. In making this argument, the

---

[6] Although Dr. Cunningham stated that a report detailing prison assaults by type was available sometime in December 2000, *see Ex parte Rayford*, WR-63,201-01, Tr. 2 at 217-18, that report is not included in the state court record. Therefore, the state habeas court correctly found that there was no proof the more detailed report was available on December 4, 2000 -- the date Smithey testified at trial. *See id.*, Tr. 11 at 3225, ¶ 48.

prosecutor merely pointed out that the defense had not presented a substantial mitigation case. For all the jury knew, the prosecutor could have been commenting on the failure of any number of witnesses other than petitioner to present mitigating evidence. This does not constitute a Fifth Amendment violation. *See Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998), *cert. denied*, 119 S.Ct. 1107 (1999) ("commenting on the absence of specific evidence in the record does not constitute a comment on the defendant's failure to testify when witnesses other than the defendant could have testified to such information"); *Brock v. McCotter*, 781 F.2d 1152, 1159-60 (5th Cir.), *cert. denied*, 106 S.Ct. 2259 (1986) (comments intended to alert jury to dearth of evidence, not defendant's failure to take the stand, did not violate defendant's right not to testify).

## I.

Petitioner challenges the standard instructions given to capital sentencing juries in Texas on two grounds: (1) the jury should have been told that petitioner would be given an automatic life sentence if they failed to agree on answers to special issues regarding future dangerousness or mitigation; and (2) the special issue on future dangerousness, which inquires whether there is a "reasonable probability" that the defendant would commit criminal acts of violence in the future that would constitute a continuing threat to society, lowers the state's burden of proof from "beyond a reasonable doubt" to a "mere probability." (*See* First. Am. Hab. Pet. at 70-71, 76-78).

## 1.

Article 37.071 of the Texas Code of Criminal Procedure requires a capital sentencing jury to answer two special issues.[7] The first question asks if "there is a probability that the defendant

---

[7] The jury is required to answer a third special issue where the defendant is charged as a party to a capital offense. *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(2) (Vernon 1999). That scenario is not applicable here. (*See* St. App. Tr. at 2, 137-38).

would commit criminal acts of violence that would constitute a continuing threat to society." *See* TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(b)(1) (Vernon 1999). The second question asks "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." *Id.*, art. 37.071, § 2(e)(1). Unanimity is required for the imposition of the death sentence -- the trial court will only sentence a defendant to death if the jury answers "yes" unanimously to the first question on future dangerousness and "no" unanimously to the second question on mitigation. *Id.*, art. 37.071, §§ 2(d)(2), 2(f)(2), & 2(g). If 10 or more jurors answer "no" to the future dangerousness special issue *or* 10 or more jurors answer "yes" to the mitigation special issue, *or* if the jury is unable to agree on an answer to either of the two questions, the court must sentence the defendant to life imprisonment. *See id.* However, Texas law prohibits the court, the defendant, and the attorneys from informing "a juror or a prospective juror of the effect of a failure of a jury to agree" on answers to either of the special issues. *See id.,* art. 37.071, § 2(a)(1). This scheme is commonly known as the "10-12 Rule." *See Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir. 2000).

At the conclusion of the punishment phase of the trial, the court instructed the jury:

> You may not answer Special Issue One "yes" unless all twelve of you agree on such answer. You may not answer Special Issue One "no" unless 10 or more of you agree that the answer to that issue should be "no." Members of the jury need not agree on what particular evidence supports a negative answer to Special Issue One.
>
> \* \* \* \*
>
> You may not answer Special Issue Two "no" unless you agree unanimously that "no" should be the answer. You may not answer

> Special Issue Two "yes" unless 10 or more of you agree that "yes" should be the answer. You need not agree on what particular evidence supports an affirmative finding on the issue.

(St. App. Tr. at 133-34). The jury proceeded to answer "yes" to the special issue on future dangerousness and "no" to the special issue on mitigation. (*Id.* at 137-38). As required by Texas law, the court did not inform the jury of the effect of a deadlock. (*Id.* at 132-36). Although petitioner contends that the failure to give such an instruction violated his Eighth and Fourteenth Amendment rights, the Fifth Circuit has held otherwise. *See, e.g. Turner v. Quarterman*, 481 F.3d 292, 300 (5th Cir.), *cert. denied*, 128 S.Ct. 34 (2007) (rejecting identical Eighth and Fourteenth Amendment arguments); *Roach v. Quarterman*, 220 Fed.Appx. 270, 277, 2007 WL 625067 at *4 (5th Cir. Feb. 26, 2007) (same); *Alexander*, 211 F.3d at 897 & n.5 (same); *Jacobs v. Scott*, 31 F.3d 1319, 1328-29 (5th Cir. 1994), *cert. denied*, 115 S.Ct. 711 (1995) (rejecting contention that "10-12 Rule" prevents jurors from considering mitigating circumstances). *See also Jones v. United States*, 527 U.S. 373, 382-84, 119 S.Ct. 2090, 2099-2100, 144 L.Ed.2d 370 (1999) (failure to instruct jury on consequences of a deadlock does not give rise to an Eighth Amendment violation). Petitioner is not entitled to relief on this ground.

2.

Petitioner also challenges the special issue on future dangerousness, which reads:

> Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, William Earl Rayford, would commit criminal acts of violence in the future that would constitute a continuing threat to society?

(St. App. Tr. at 137). According to petitioner, this special issue violates the Fifth, Sixth, and Eighth Amendments, as interpreted by the Supreme Court in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d

435 (2000), by impermissibly lowering the state's burden of proof from "beyond a reasonable doubt" to a "mere probability."

In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 120 S.Ct. at 2362-63. The Supreme Court relied on *Apprendi* in *Ring* to invalidate a portion of Arizona's capital sentencing scheme which allowed the trial judge to determine the presence or absence of aggravating factors for imposition of the death penalty. *Ring*, 122 S.Ct. at 2443. However, at least two federal district courts have held that *Apprendi* and *Ring* do not apply to the special issues submitted to a Texas capital sentencing jury because those issues do not bear on a defendant's *eligibility* for the death penalty, which is established during the guilt-innocence phase of trial. Instead, the special issues narrow the jury's discretion in determining *whether* capital punishment is warranted on the facts of a particular case. *See Kerr v. Thaler*, No. 4-06-CV-0372-Y, 2009 WL 2981906 at *5 (N.D. Tex. Sept. 17, 2009), *COA denied*, No. 09-70030 (5th Cir. Jun. 30, 2010); *Woodard v. Thaler*, 702 F.Supp.2d 738, 781-82 (S.D. Tex. 2010), *COA denied*, 414 Fed.Appx. 675, 2011 WL 701146 (5th Cir. Mar. 1, 2011); *but see Berkley v. Quarterman*, 507 F.Supp.2d 692, 743 (W.D. Tex. 2007), *COA denied*, 310 Fed.Appx. 665, 2009 WL 405858 (5th Cir. Feb. 18, 2009), *cert. denied*, 130 S.Ct. 366 (2009) (suggesting that future dangerousness might be an aggravating factor that must be determined in compliance with *Ring*).

Even if *Apprendi* and *Ring* apply to the Texas capital sentencing scheme, the jury charge in this case required the state to prove future dangerousness beyond a reasonable doubt. Not only does the special issue itself require such proof, (*see* St. App. Tr. at 137), but the jury was instructed

elsewhere in the charge that "[t]he State has the burden of proof to prove beyond a reasonable doubt that the answer to Special Issue One should be 'yes.'" (*Id.* at 133). Thus, "[e]ven if Texas' future dangerousness special issue could be construed as falling within the scope of the constitutionally-mandated eligibility decision, Texas law clearly places the burden of proving same beyond a reasonable doubt on the prosecution." *Berkley,* 507 F.Supp.2d at 743; *see also Scheanette v. Quarterman,* 482 F.3d 815, 827-28 (5th Cir. 2007) (rejecting similar argument that special issue on future dangerousness "dilutes" the state's burden of proof); *Rowell v. Dretke,* 398 F.3d 370, 379 (5th Cir.), *cert. denied,* 126 S.Ct. 103 (2005) (same). This ground for relief should be overruled.

J.

Petitioner contends that the Eighth Amendment bars his execution because he suffers from a "mental illness and disability" that prevented him from controlling his conduct at the time of the offense. (*See* First Am. Hab. Pet. at 61-62). In support of that argument, petitioner relies on *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), which prohibits the execution of mentally retarded persons. However, the Fifth Circuit has refused to extend *Atkins* to claims of mental illness. *See ShisInday v. Quarterman,* 511 F.3d 514, 521 (5th Cir. 2007), *cert. denied,* 129 S.Ct. 62 (2008); *In re Woods,* 155 Fed.Appx. 132, 136, 2005 WL 3087882 at *3 (5th Cir. Nov. 17, 2005). This ground for relief is foreclosed by circuit precedent.

K.

The majority of petitioner's claims involve his representation at trial and on appeal. Succinctly stated, petitioner contends that he received ineffective assistance of counsel at trial because his attorney: (1) failed to object to the use of his 1986 murder conviction to enhance his sentence; (2) did not object when the prosecutor commented on his failure to testify; (3) failed to

challenge the composition of the venire panel; (4) did not introduce medical records of his 1986 suicide attempt; (5) failed to retain a forensic medical examiner; and (6) did not conduct an adequate investigation into mitigating circumstances. (*See* First Am. Hab. Pet. at 11-31). Petitioner also complains that he received ineffective assistance of counsel on appeal because his lawyer did not raise various claims related to the testimony of Royce Smithey. (*Id.* at 68-70).

1.

The Sixth Amendment to the United States Constitution guarantees a defendant reasonably effective assistance of counsel at all critical stages of a criminal proceeding. *See Cuyler v. Sullivan*, 446 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980). To prevail on an ineffective assistance of counsel claim, a habeas petitioner must satisfy the two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, the petitioner must demonstrate that the performance of his attorney fell below an objective standard of reasonableness. *Id.*, 104 S.Ct. at 2064. Second, the petitioner must prove that he was prejudiced by his attorney's substandard performance. *Id.* at 2067. Prejudice results when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 2068; *see also Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993) (habeas petitioner must show that trial result was unreliable or proceeding fundamentally unfair due to deficient performance of counsel). There is a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance. *See Romero v. Lynaugh*, 884 F.2d 871, 876 (5th Cir. 1989), *cert. denied*, 110 S.Ct. 1311 (1990). In order to obtain federal habeas relief, a petitioner must affirmatively show how the actions of his attorney deprived him of a fair trial. *See Czere v. Butler*, 833 F.2d 59, 63-64 (5th Cir. 1987).

2.

The court has already addressed most of the alleged errors which form the basis of petitioner's ineffective assistance of counsel claims. In particular, the court has determined that petitioner's 1986 murder conviction was properly used to enhance his sentence, that the prosecutor did not improperly comment on petitioner's failure to testify, and that young adults and Hispanics were not systematically excluded from the venire panel. These grounds should be summarily overruled.

Nor has petitioner shown that he was prejudiced by counsel's failure to introduce medical records of his suicide attempt. Although petitioner believes that these medical records would have provided "graphic and compelling evidence of [his] remorse" following the murder of his wife, (*see* First Am. Hab. Pet. at 25), the substance of those records was before the jury through the testimony of other witnesses. When asked by defense counsel why petitioner was admitted to Parkland Hospital after the murder, Dr. Kessner responded:

> The record indicates that he stabbed himself repeatedly. There were some bubbling puncture wounds that they identified I think, or he had almost amputated his wrist. Let me get the records. I know he had to have his gallbladder removed . . . The record said he nearly amputated his right hand.

(SF-46 at 182-83). Later in the trial, Dallas Police Officer Thomas E. Hitt, who was dispatched to the murder scene, testified that petitioner jumped through an upstairs window without provocation and had "bad wounds to his stomach and chest area." (SF-47 at 98, 101-03). Given this testimony, the medical records of petitioner's suicide attempt, which describe his injuries in more detail but primarily document treatment for those injuries over time, would have added very little to the jury's understanding of petitioner's mental state following the 1986 murder. *See Ex parte Rayford*, WR-63,201-01, Tr. 2 at 286-404. Moreover, to the extent petitioner's suicide attempt shows remorse, it

is remorse for the murder of Gail Rayford, his former wife -- not remorse for the murder of Carol Hall, the victim in this case. It strains credulity to suggest that the jury would have viewed petitioner in a more favorable light because he showed remorse for a murder committed more than 14 years earlier.

With respect to counsel's failure to retain a forensic medical examiner, who allegedly would have testified that the victim died before being dragged away to a culvert, (*see* First Am. Hab. Pet. at 28), petitioner has not identified any potential witness who was willing and available to provide such testimony. His conclusory assertion that counsel was ineffective in this regard does not merit habeas relief. *See Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (to prove that counsel was ineffective for failing to call a witness, "the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense").

3.

Petitioner contends that his attorney failed to conduct an adequate investigation into mitigating circumstances because he did not employ a mitigation specialist or a defense investigator and failed to review the court file from his 1986 murder case, which contained evidence of his mental incompetency. (*See* First Am. Hab. Pet. at 13-20). "An attorney has a duty to independently investigate the charges against his client." *Bower v. Quarterman*, 497 F.3d 459, 467 (5th Cir. 2007), *cert. denied*, 128 S.Ct. 2051 (2008), *citing Wiggins v. Smith*, 539 U.S. 510, 524, 123 S.Ct. 2527, 2536-37, 156 L.Ed.2d 471 (2003). While the precise contours of a reasonable investigation are fact-specific and not clearly defined, the Fifth Circuit has held that "[i]nformed evaluation of potential defenses to criminal charges and meaningful discussion with one's client of the realities of his case

are cornerstones of effective assistance of counsel." *Id., quoting Washington v. Watkins*, 655 F.2d 1346, 1355 (5th Cir. 1981), *cert. denied*, 102 S.Ct. 2021 (1982). The reasonableness of an attorney's investigation depends, in part, on information supplied by the defendant. *Ransom v. Johnson*, 126 F.3d 716, 723 (5th Cir.), *cert. denied*, 118 S.Ct. 361 (1997); *see also Strickland*, 104 S.Ct. at 2066 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions . . . In particular, what investigation decisions are reasonable depends critically on such information."). When assessing the reasonableness of an attorney's investigation, the court must "consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005), *quoting Wiggins*, 123 S.Ct. at 2538. To establish that counsel was ineffective for failing to investigate, "a petitioner must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial." *Id.; see also Rompilla v. Beard*, 545 U.S. 374, 390-91, 125 S.Ct. 2456, 2468, 162 L.Ed.2d 360 (2005) (granting habeas relief where counsel's failure to view court file resulted in failure to discover "mitigation leads," including evidence of childhood in slum environment, history of alcohol abuse, and previous psychological tests indicating schizophrenia and other disorders as well as low level of cognition).

The record shows that defense counsel presented a well-developed mitigation case at the punishment phase of the trial, primarily through the testimony of two family members and Dr. Kessner. One of petitioner's sisters, Lee Annie Lee, testified that petitioner was the eighth of nine children fathered by three different men. (*See* SF-46 at 37-38, 40). Four of his siblings were either deceased or severely debilitated by the time of trial. (*Id.* at 38). Lee said that petitioner's alcoholic

father abandoned the family when petitioner was between two and four years old. (*Id.* at 40-41). Petitioner's mother worked from 6:00 a.m. until 9:30 p.m., often leaving her young children unsupervised. (*Id.* at 47). Lee explained that petitioner's mother was beaten so badly by a boyfriend in the presence of her children that she had to be "doctored" to go back to work. (*Id.* at 46-47). Drug-related crimes, rapes, murders, and violence were a regular part of life in the projects where petitioner lived. (*Id.* at 60). Another sister, Debra Lynn Williams, confirmed that petitioner's mother was regularly abused by her boyfriend and left the children without adult supervision. (*Id.* at 65-66). Williams testified that petitioner and his brother started taking drugs while teenagers, and that petitioner was a different person when he drank alcohol. (*Id.* at 67-68).

Dr. Kessner, who reviewed more than 1,000 pages of documents and interviewed petitioner and seven members of his family, testified to a torrent of issues faced by petitioner during his childhood. (*Id.* at 110-12). Among these were that petitioner's family was a product of "multigenerational substance abuse," that drugs were readily available in the community, that petitioner witnessed a pattern of domestic violence, that he had no appropriate male influence in his life, that his mother was frequently absent due to her work and social life, and that petitioner was exposed to threats of violence and adult sexual behavior. (*Id.* at 120-21). Petitioner's mother described herself to Dr. Kessner as "fast on the streets," and admitted to having sexual relations with multiple partners. (*Id.* at 138). Dr. Kessner also recounted a conversation with petitioner about his exposure to adult sexual activity:

> Well, he talked about being able to hear his mother when she's having sexual relations with whoever she happened to be involved with. And he also talked about going into the cafes and working as a shoeshine boy when he was little. So he's in an adult entertainment environment when he's around nine years old.

> Then he mentioned when he was older his mother bought a tuxedo from the garage sale and asked him to go with her as an escort to parties, cafes, which is inappropriate for an adolescent boy to be involved in that entertainment or an adult party like that, alcohol and sexual expressions going on between adults, it's not appropriate for a child to be there.
>
> One of the things he mentioned to me was that when -- he couldn't quite calculated [sic] exactly between the ages of six and nine he described that he was at Fair Park. He had gone there and he couldn't remember if he had gone with an older sibling, but at this point in time it was dark outside the fair, waiting for the bus, and a man pulled up in a truck and said, you know, come over here.
>
> And finally the man said your dad sent me to get you. So he went running and got in the truck. Driving down the road the man gave him instructions which didn't feel right. Get down on the floorboard, a few other types of things to sort of set up the incidents of a sexual contact. And at the first opportunity at a light he jumped out of the truck and ran to a cab driver who helped him get home.

(*Id.* at 133-34). Petitioner told Dr. Kessner that he remembered his mother having a "knock down drag out kind of fight" with her boyfriend on occasions when the boyfriend wanted to leave. (*Id.* at 138-39). Dr. Kessner explained to the jury that petitioner was insecure with girls and about his clothing, that his older brother abandoned him, and that he suffered from untreated depression throughout much of his life. (*Id.* at 140, 142).

An attorney must conduct an adequate investigation into mitigating circumstances for sentencing purposes, including research into the defendant's family and social history. *See Vasquez v. Thaler*, 389 Fed.Appx. 419, 425, 2010 WL 3168206 at *4 (5th Cir. Aug. 11, 2010), *cert. denied*, 131 S.Ct. 2445 (2011), *citing Wiggins*, 123 S.Ct. at 2536-37. However, defense counsel is not required to employ a mitigation specialist in order to be effective. *See Hankins v. Quarterman*, 288 Fed.Appx. 952, 957-58, 2008 WL 3820922 at *4 (5th Cir. Aug. 15, 2008), *cert. denied*, 129 S.Ct. 1010 (2009). Here, counsel presented mitigating evidence, including petitioner's family and social

history, through the testimony of family members and Dr. Kessner. Petitioner has failed to point to any specific evidence that was not uncovered because his attorney did not employ a mitigation specialist or a capital defense investigator.

Petitioner also faults defense counsel for failing to review the court file from his 1986 murder case. As best the court understands this claim, petitioner appears to argue that a review of the file would have put counsel on notice that petitioner had a mental competency issue and would have supported his "abandonment rage" theory. (*See* First Am. Hab. Pet. at 15-20). None of the documents in petitioner's 1986 case file suggest that he was mentally incompetent. To the contrary, the file contains a psychiatric evaluation indicating that petitioner was fully competent to enter a plea of *nolo contendere* in the murder case. *See Ex parte Rayford*, WR-63,201-01, Tr. 2 at 257-58.[8] Regarding his "abandonment rage" theory, petitioner notes that wife-killings typically involve excessive force, or "overkill," and that those who kill their wives often attempt suicide. (*See* First Am. Hab. Pet. at 18). The murders of Gail Rayford, who was stabbed 11 times, and Carol Hall, who was strangled, stabbed and beaten, were both suggestive of "overkill." (*See* SF-44 at 38-40, 53, 62-63, 68-73; SF-47 at 115, 119). Petitioner attempted suicide after he murdered Gail Rayford. (*See* SF-46 at 182-83; SF-47 at 101-03). Had evidence of the "overkills" and his suicide attempt been presented in the context of his troubled background through a mental health expert, who could have explained "abandonment rage," petitioner contends that the jury might have believed that events in his upbringing, in conjunction with a "mental abnormality," caused him to behave impulsively and without the necessary *mens rea* to commit the offense of murder. (*See* First. Am. Hab. Pet. at 17).

---

[8] The 1986 case file also contains a notice of a potential insanity defense, a motion requesting more time to investigate petitioner's mental condition, and a letter from petitioner to the judge stating that he "did not knowingly and intentionally" murder his wife. *See Ex parte Rayford*, WR-63,201-01, Tr. 2 at 246-55. However, none of the self-serving documents filed by or on behalf of petitioner are probative of his alleged mental incompetency.

The state court record shows that defense counsel did, in fact, investigate a potential "abandonment rage" theory. In an affidavit presented to the state habeas court, counsel explained:

> During my conversations with Mr. Rayford, I also tried to develop mitigating evidence in relation to the capital murder case, specifically, psychological issues Mr. Rayford may have had with his mother. I truly believe that Mr. Rayford's criminal problems are a result of his having been raised by a single mother, who allowed Rayford to witness details of her social and dating life inappropriate to his age and who left him in the care of his older siblings on many occasions. I believe this is the origin of Mr. Rayford's anger towards women and his inability to establish healthy relationships with them. If not for this and his recreational drug use, I believe Mr. Rayford would not be where he is now.
>
> I discussed this theory with Mr. Rayford at length. He agreed it might have some truth. But while Mr. Rayford acknowledged his mother's shortcomings, he also recognized that she struggled to raise him alone, and he said he was not going to bring her into the courtroom to malign her past sexual conduct. Both Mr. Rayford and other members of his family did not want their aging mother disgraced in the courtroom. Because of this, I was unable to develop fully the theory that the circumstances of Mr. Rayford's upbringing caused his problems with the law, although psychologist Gilda Kessner did testify somewhat about the issue.

*Ex parte Rayford*, WR-63,201-01, Tr. 10 at 3066. Based on this affidavit, the state court found that petitioner prevented his attorney from presenting an "abandonment rage" theory to the jury, and that counsel was not ineffective in this regard. *Id.*, Tr. 11 at 3296, ¶ 334. Petitioner has not adduced any evidence, much less clear and convincing evidence, to rebut that finding.[9]

---

[9] Petitioner appears to rely on the affidavit of Dr. Kessner to support his claim that wife-killings are "reactive unplanned events." *See Ex parte Rayford*, WR-63,201-01, Tr. 2 at 281, ¶ 14.7. Not only does petitioner ignore the fact that the victim in this case was not his wife, but none of the research identified by Dr. Kessner in her affidavit suggests that someone acting with "abandonment rage" lacks the necessary *mens rea* to commit a crime. Moreover, *mens rea* is a concept relevant to guilt-innocence, not punishment. To the extent petitioner maintains that this attorney should have introduced evidence of "abandonment rage" and his 1986 murder conviction during the guilt-innocence phase of his trial, it clearly would have been prejudicial to do so.

To the extent petitioner argues that a mental health expert could have presented evidence of a serious mental disease or defect beyond that adduced at trial, he has offered no proof that such is the case. In fact, petitioner has not proffered any evidence that he suffers from a mental illness other than depression -- a condition noted by Dr. Kessner in her testimony. (*See* SF-46 at 123, 125, 142). Unlike the situation in *Rompilla*, there is no evidence that the file from petitioner's 1986 murder case contained mitigating evidence or mitigation "leads." *Cf. Rompilla*, 125 S.Ct. at 2468. Therefore, the state habeas court properly denied relief on this ground.

4.

Petitioner alleges that he received ineffective assistance of counsel on appeal because his lawyer did not raise various claims related to the testimony of Royce Smithey. "The Constitution does not require appellate counsel to raise every nonfrivolous ground that might be pressed on appeal." *Ellis v. Lynaugh*, 873 F.2d 830, 840 (5th Cir.), *cert. denied*, 110 S.Ct. 419 (1989); *see also Jones v. Barnes*, 463 U.S. 745, 752-53, 103 S.Ct. 3308, 3313, 77 L.Ed.2d 987 (1983). Instead, counsel is obligated only to raise and brief those issues that are believed to have the best chance of success. *See Schaetzle*, 343 F.3d at 445; *United States v. Williamson*, 183 F.3d 458, 463 (5th Cir. 1999). In order to prove ineffective assistance of appellate counsel, a petitioner must show that the decision not to raise an issue on appeal fell below an objective standard of reasonableness. *United States v. Phillips*, 210 F.3d 345, 348 (5th Cir. 2000), *citing Strickland*, 104 S.Ct. at 2064. This reasonableness standard requires counsel "to research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful." *Id., quoting Williamson*, 183 F.3d at 462. As with other ineffective assistance of counsel claims, a petitioner must show that, but for appellate

counsel's deficient performance, the outcome of the appeal would have been different. *See Amador v. Quarterman*, 458 F.3d 397, 411 (5th Cir. 2006), *cert. denied*, 127 S.Ct. 2129 (2007).

Appellate counsel raised 24 nonfrivolous issues in a well-researched brief.[10] Although counsel did not challenge Smithey's testimony, petitioner has not shown that his death sentence would have been reversed had such a claim been raised on direct appeal. In fact, the court has determined that there was nothing improper about Smithey's testimony. *See Jackson v. Quarterman*, No. 3-06-CV-0494-G, 2008 WL 58879 at *10 (N.D. Tex. Jan. 3, 2008), *aff'd*, 358 Fed.Appx. 585, 2009 WL 5102867 (5th Cir. Dec. 23, 2009) (appellate counsel not ineffective for failing to appeal conviction on grounds that were considered and rejected by federal habeas court). This ground for relief should be overruled.

## L.

Finally, petitioner contends that the cumulative effect of these errors deprived him of a fair trial. This argument implicates the cumulative error doctrine, which provides that "an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998), *cert. denied*, 119 S.Ct. 887 (1999). Because petitioner has failed to establish *any* error in the conduct of his state trial, relief is not available under the cumulative error doctrine. *See Miller v. Johnson*, 200 F.3d 274, 286 n.6 (5th Cir.), *cert. denied*, 121 S.Ct. 122 (2000) (petitioner who failed to demonstrate any error by trial counsel could not establish cumulative error).

---

[10] Counsel focused his appeal on the legality of petitioner's death sentence, the improper admission of evidence, the sufficiency of the evidence, jury selection issues, and the constitutionality of the Texas death penalty statute. *See Rayford*, 125 S.W.3d at 524-34.

## RECOMMENDATION

Petitioner's application for writ of habeas corpus should be denied.

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: July 12, 2011.

JEFF KAPLAN
UNITED STATES MAGISTRATE JUDGE